1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   JENNIFER G. REDMOND, Cal Bar No. 144790
2  BENJAMIN O. AIGBOBOH, Cal Bar No. 268531
   MARGARET M. SHEERIN, Cal. Bar No. 346641
3  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4109
4  Telephone:   415.434.9100
   Facsimile:   415.434.3947
5  Email:       jredmond@sheppardmullin.com
                baigboboh@sheppardmullin.com
6                msheerin@sheppardmullin.com

7  *Attorneys for Plaintiff*
   ZOOX, INC.

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  ZOOX, INC., a Delaware corporation, | Case No. |
| 12                    Plaintiff, | **COMPLAINT FOR:** |
| 13          v. | **(1) BREACH OF CONTRACT;** |
| 14  VERONICA NAVARRO, an individual, | **(2) MISAPPROPRIATION OF** |
| 15                    Defendant. | **TRADE SECRETS (18 U.S.C. §** |
| 16  | **1836 *et seq.*); AND** |
| 17  | **(3) VIOLATION OF COMPUTER DATA AND ACCESS FRAUD ACT (Cal. Penal Code § 502).** |
| 18  | **JURY TRIAL DEMANDED** |

19
20
21
22
23
24
25
26
27
28

Plaintiff Zoox, Inc. ("Zoox") for its Complaint against Defendant Veronica Navarro ("Navarro") states as follows:

**<u>INTRODUCTION</u>**

1.      Zoox is an innovative pioneer in the highly-competitive and high stakes field of autonomous mobility.  To maintain its competitive position, Zoox takes the security of its confidential and proprietary information and trade secrets extremely seriously.  Among other things, Zoox has implemented various information security measures to identify and protect the company from unauthorized employee activity with respect to its confidential and proprietary information and trade secrets including, *inter alia*, restricting use of and imposing technical and physical controls (*e.g.*, encryption) on the use of removable media (*e.g.*, flash drives, external hard drives) attached to Zoox computing devices that contain such information.  And because the likelihood of certain malicious activity is increased in certain contexts—such as when an employee anticipates imminent performance management or termination—Zoox has implemented heightened protocols to monitor employee activity during these, and other, timeframes and identify unauthorized activity.

2.      That is exactly what happened here.  Zoox's security protocols caught former employee Navarro in the act of misappropriating Zoox's sensitive data and documents when she knew her work performance was under scrutiny.  Navarro selected a large number of highly sensitive files and downloaded them to an external drive that she connected to her Zoox-issued laptop.  She also used software for the unauthorized purpose of taking screenshots of the Zoox data and information displayed on the screen of her work computer.  That software captured hundreds and hundreds of screenshots for at least 30 days prior to her departure.  Those screenshots are contained in files that Navarro uploaded to that same external drive.  Navarro also created and downloaded to her external drive numerous videos (*e.g.*, ".wmv" files) of what appear to be, from the file names, confidential internal Zoox meetings.  Navarro could have engaged in additional wrongdoing of which Zoox is not yet aware, such as

1    moving the files to other locations, sharing files with third parties, using them in

2    connection with interviewing with competitors.  What Zoox does know is that Navarro

3    has refused to cooperate to return the Zoox documents and files she took, instead

4    holding them hostage unless Zoox accedes to her demands.

5        3.    Navarro's egregious and unlawful actions must be enjoined and she must

6    be ordered to return all documents and files belonging to Zoox before she can cause

7    further irreparable harm to Zoox's legitimate business interests, including protection

8    of its trade secrets, and proprietary and confidential information.

9                                    **PARTIES**

10        4.    Zoox is a Delaware corporation with its principal place of business located

11    at 1149 Chess Drive, Foster City, California 94404.

12        5.    Upon information and belief, Navarro is—and at all relevant times has

13    been—a resident of Foster City, California.

14                            **JURISDICTION AND VENUE**

15        6.    Jurisdiction is proper in this district pursuant to 28 U.S.C. §§ 1331 and

16    1367 because Zoox asserts claims under the federal Defend Trade Secrets Act, codified

17    at 18 U.S.C. § 1836 *et seq.*

18        7.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (b)(2)

19    because Navarro resides in this district and a substantial part of the events or

20    omissions giving rise to Zoox's claims occurred in this district.

21                            **GENERAL ALLEGATIONS**

22    **Zoox's Business**

23        8.    Zoox was founded in 2014 with a clear vision:  to create autonomous

24    mobility—*i.e.*, self-driving vehicles and related technology—from the ground up that

25    would provide consumers with a safer, cleaner, and more enjoyable way to get around.

26    To do so, Zoox developed an entirely new type of vehicle specifically designed, or

27    "purpose-built," for artificial intelligence to drive and humans to enjoy.  After more

28    than a decade, Zoox has achieved its goal.  It has developed a one-of-a-kind all-electric

robotaxi without manual controls (*e.g.*, a steering wheel or pedal) or driver that is capable of navigating human environments and provides an unmatched rider experience:



9.    Not only did Zoox design and build its robotaxi (*i.e.*, Zoox's "hardware") from the ground up, it also developed the artificial intelligence that pilots it (*i.e.*, Zoox's "software"). Since, at least, 2015, Zoox has retrofitted a fleet of test vehicles with sensors to map localities, gather data, and fine-tune its artificial intelligence its artificial intelligence in anticipation of operating Zoox's custom-built vehicles. In the near decade since it launched its test fleet, Zoox's artificial intelligence has become more advanced and sophisticated, while simultaneously ensuring a timely, safe, and comfortable transportation experience for riders.

10.    Given its goal of creating a first-of-its-kind and purpose-built autonomous robotaxi for ride-hailing, Zoox has continuously fostered a culture of innovation and invention. It has expended countless hours and billions of dollars developing its autonomous driving hardware and software over the course of a decade. Its drive for innovation and invention have borne fruit; as one example, Zoox has been awarded

1   thousands of patents worldwide on its way to developing its all-new robotaxi—a
2   number that will continue to grow. Zoox has also invested heavily in, among other
3   things, testing, safety, expansion plans, and key business partnerships.

4       11.     Zoox is now entering a critical period in its history. After years of
5   everything from design and development to clearing local regulatory hurdles, Zoox has
6   publicly announced the imminent launch of its robotaxi and robotaxi service in Las
7   Vegas, Nevada—a process that began in earnest with the launch of test fleet vehicles
8   in Las Vegas in 2019. Public riders will be able to use Zoox's ride-hailing service to
9   summon a Zoox robotaxi in and around the famous—and highly-trafficked—Las Vegas
10  Strip. Las Vegas is just the beginning; Zoox has publicly announced plans to expand
11  its testing and robotaxi services to San Francisco, Austin, Miami, and Los Angeles in
12  the near future. Behind these public announcements are years and years of non-public
13  research and development and implementation planning and execution, and many
14  billions of dollars of investments.

15      12.     Although an early entrant, Zoox is not alone in the autonomous driving
16  space—an industry McKinsey & Company estimated in 2023 could create $300 to $400
17  billion in revenue by 2035 and others have estimated could be valued at $10 trillion in
18  the near future.[1] Zoox faces competition from, among others, autonomous driving
19  technology companies like Waymo, car companies like Tesla, BMW, and Mercedez-
20  Benz, and ride-hailing services like Uber and Lyft. Maintaining the utmost secrecy of
21  R&D and implementation planning and execution is essential in the intense
22  competition to be first to market

23

24

---

25  [1]  Deichman, Johannes, et al., *Autonomous Driving's Future: Convenient and
26  Connected*, MCKINSEY & COMPANY, https://www.mckinsey.com/industries/automotive-
    and-assembly/our-insights/autonomous-drivings-future-convenient-and-connected
27  (last visited April 22, 2025); Brett Winston, *Who will win the $10 trn war of the
    robotaxis*, TRUSTNET.COM, https://www.trustnet.com/news/13443967/who-will-win-
28  the-10trn-war-of-the-robotaxis (last visited April 22, 2025).

**Navarro's Employment with Zoox**

13.    On August 2, 2021, Navarro began her at-will employment with Zoox as Senior Technical Program Manager in Zoox's Program Management Office.  Zoox's Program Management Office drives cross-functional program planning and execution by partnering with Zoox leaders in vehicle development, software engineering, manufacturing, fleet operations, policy, and business functions to develop and deliver major Zoox milestones on the path to launch and beyond.

14.    As Senior Technical Program Manager, Navarro was responsible for developing, scaling, and executing processes and methodologies to validate and deploy Zoox's robotaxis' hardware and software—an integral part of taking Zoox's vehicle platform from the manufacturing floor to service readiness on public roads across multiple cities.  Navarro's role required close collaboration with Zoox's operations, hardware, firmware, safety, software, manufacturing, and policy teams (among others) to achieve Zoox's goals.  To do this, Navarro was required to translate the requirements of corporate milestones into detailed technical and operational roadmaps, timelines, and deliverables and to report on, among other things, status, issues and risks, and accomplishments in the validation of Zoox's vehicle platform.

15.    As Senior Technical Program Manager, Navarro was expected to maintain a technical understanding of, among other things, Zoox's vehicle platforms, software lifecycle, safety clearance processes, and test operations.  For the authorized purpose of doing her job, Navarro was exposed and given access to Zoox's confidential documents and proprietary information related to Zoox's entire business including, but not limited to, its vehicle platforms, software lifecycle, safety clearance process, test operations, expansion plans, and business partnerships.

**Navarro's Employee Proprietary Information and Invention Assignment Agreement**

16.    Because Zoox's trade secrets and proprietary and confidential information are integral to its ability to bring its robotaxis to market in a highly-

Case No.
COMPLAINT

competitive market, and because Zoox provided Navarro with access to such sensitive information, Zoox required Navarro to enter into an Employee Proprietary Information and Information Assignment Agreement ("Proprietary Information Agreement") to protect its trade secrets and proprietary and confidential information.

17.    Navarro signed the Proprietary Information Agreement on July 15, 2021, as a condition of accepting Zoox's offer of employment—an offer which included the payment of a significant salary, a signing bonus, a restricted stock unit award, and the potential to earn stock appreciation rights.[2]

18.    The Proprietary Information Agreement, which is governed by and construed in accordance with the laws of the State of California, defines "Proprietary Information" as:

> any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by [Navarro] before or after the execution of this [Proprietary Information] Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by [Zoox] and its affiliates, or pertaining in any manner to any person or entity to whom [Zoox] owes a duty of confidentiality.

Ex. A §§ 2(a), 10(b).  This Proprietary Information "includes, but is not limited to, the following types of information and materials:"

> (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the [Zoox]'s other employees and independent contractors; and (v) any other information or materials

---

[2]  A true and correct copy of the Proprietary Information Agreement signed by Navarro is attached hereto as **Exhibit A**.

relating to the past, present, planned or foreseeable business, products, developments, technology or activities of [Zoox].

*Id.*

19.    The Proprietary Information Agreement places restrictions on, and creates obligations related to, on Navarro's use of Proprietary Information.  Among other things, the Proprietary Information Agreement:

(a)    requires Navarro to hold Proprietary Information in strict confidence during her employment and at all times thereafter (Ex. A § 3(a));

(b)    prohibits Navarro from using, reproducing, disclosing, or delivering Proprietary Information during her employment and at all times thereafter, except as may be necessary to perform her duties as a Zoox employee or as permitted by a duly authorized Zoox representative (*id.*);

(c)    requires that Navarro maintain at her work station and/or any other place under her control only such Proprietary Information as she has a current "need to know" and that Navarro return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists (*id.* § 3(b)); and

(d)    requires that Navarro promptly return all written or tangible materials containing any Proprietary Information in her possession upon termination of her employment for any reason or at any other time at Zoox's request and that Navarro not retain any written or other tangible material containing any Proprietary Information following termination of her employment (*id.* § 9).

20.    By signing the Proprietary Information Agreement, Navarro acknowledged that any breach of the Proprietary Information Agreement would cause irreparable injury to Zoox for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to Zoox.  Ex. A § 10.  Navarro therefore agreed that if she breached any provision of the Proprietary Information

1   Agreement, Zoox would be entitled to injunctive relief to remedy any breach or prevent

2   any threatened breach in addition to any other remedies available to Zoox at law or in

3   equity. *Id.*

4   **Navarro's Acknowledgment of Zoox's Crew Handbook**

5       21.     Navarro was provided with a copy of Zoox's Crew (*i.e.*, employee)

6   Handbook, which was effective as of December 7, 2020 ("2020 Handbook"), and

7   required to acknowledge that she was responsible for abiding by all policies and

8   procedures in the 2020 Handbook (as well as all other Zoox policies and procedures)

9   and would be bound by any changes to it.     Navarro signed the required

10  acknowledgement on August 10, 2021.[3]

11      22.     Section 1.4 of the 2020 Handbook, entitled "Code of Business Conduct and

12  Ethics," requires that "Zoox crew [*i.e.*, employees]…always act lawfully, ethically, and

13  in the best interests of Zoox" in "performing their job duties" and "sets out basic guiding

14  principles" for doing so. Ex. B § 1.4. Among other things, these principles require that

15  "crew…use their judgment to act, at all times and in all ways, in the best interest of

16  Zoox" in "performing their job duties" (*id*. § 1.4.1) and to avoid "conflicts of interests"

17  (*id*. § 1.4.2), which exist "when a crew member's personal interest interferes with the

18  best interest of Zoox" (*id*. § 1.4.1).

19      23.     Section 1.9 of the 2020 Handbook ("Confidentiality") confirms that, "[i]n

20  the course of employment with Zoox, crew will have access to Confidential Information

21  regarding Zoox's business," which "includes, but is not limited to:"

22      (i) research, development, technical or engineering information, know-
        how, data processing or computer software, programs, tools, data,
23      designs, diagrams, drawings, schematics, sketches or other visual
        representations, plans, projects, manuals, documents, files, photographs,
24      results, specifications, trade secrets, inventions, discoveries,
        compositions, ideas, concepts, structures, improvements, products,
25      prototypes, instruments, machinery, equipment, processes, formulas,
        algorithms, methods, techniques, works in process, systems, technologies,
26      disclosures, applications and other materials; (ii) financial information
        and materials, including, without limitation, information and materials

27

28  [3] A true and correct copy of relevant portions of the 2020 Handbook is attached hereto
    as **Exhibit B**.

> relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the [Zoox]'s other crew and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the [Zoox]. This information is "confidential" regardless of whether it is marked as confidential, proprietary, or any other confidential marking.

Ex. B § 1.9.

24.    Section 1.9 of the 2020 Handbook mandates that "[e]ach crew member is responsible for safeguarding Confidential Information obtained in connection with their employment" and that:

> All crew must protect Confidential Information by safeguarding it when in use, using it only for the business of the Company, and disclosing it only when authorized to do so and to those who have a legitimate business need to know about it. This duty of confidentiality applies whether crew are on or off Zoox premises, and during and after employment with Zoox.

Ex. B § 1.9. Section 1.9 further provides that "[a]ny breach of this policy will not be tolerated." *Id.*

25.    Section 1.9 of the 2020 Handbook also confirms that that each "crew member must execute" the Proprietary Information Agreement "[a]s a condition of employment and "prior to starting employment with Zoox." Ex. B § 1.9.

26.    Section 15 of the 2020 Handbook ("Acceptable Use Policy") "specifies requirements for Zoox computing resources and protects [Zoox's] customers, Crew, company, and other partners from harm caused by both deliberate and inadvertent misuse of [Zoox's]…data" and notifies employees that "[a]ny crew member found to have violated" the Acceptable Use Policy "may be subject to disciplinary action, up to and including termination of employment." Ex. B § 15.

27.    Although Zoox updated its Crew Handbook throughout the course of Navarro's employment (with updates available on Zoox's intranet), the obligations

1  related to protection of Zoox's confidential and proprietary information and trade

2  secrets remained consistent at all times.

3  **Zoox Protects Its Confidential Information**

4      28.    Zoox takes the protection of its confidential and proprietary information

5  and trade secrets extremely seriously.  Among other things, Zoox:  requires employees

6  to execute confidentiality agreements substantially similar to the Proprietary

7  Information Agreement; restricts access to trade secrets and confidential documents

8  based on employee position and business need; uses device management systems;

9  requires that employees use passwords on Zoox devices; identifies and/or marks certain

10  data as restricted; restricts and imposes technical and physical controls on authorized

11  removable devices (*e.g.*, flash drives, external hard drives) including encryption of any

12  removable media containing any confidential or proprietary information or trade

13  secrets; implements security measures to prevent and detect unauthorized disclosure

14  or use of trade secrets and confidential information; conducts investigations when

15  security protocols are breached; and implements other related steps and practices.

16      29.    Zoox also maintains company policies regarding protection of confidential

17  information and trade secrets.  For example, Zoox requires employees—including

18  Navarro—to acknowledge and agree to comply with its Acceptable Use Policy, which

19  "specifies requirements for Zoox computing resources and protects [Zoox's] customers,

20  Crew, company, and other partners from harm caused by both deliberate and

21  inadvertent misuse of [Zoox's] computing resources and data," and notifies employees

22  that "[a]ny crew member found to have violated" the Acceptable Use Policy "may be

23  subject to disciplinary action, up to and including termination of employment."  Ex. B

24  § 15.  Other policies related to confidential information and trade secrets with which

25  employees must comply include policies establishing how Zoox data is to be classified

26  (*e.g.*, public, confidential, restricted), handled, and protected (Data Classification and

27  Lifecycle Policy), how data is accessed (Access Management Policy), and usage of Zoox

28  networks and devices (Network and Device Usage Security Policy).

Case No.
COMPLAINT

1    **Navarro's Theft of Zoox's Proprietary Information and Termination**

2        30.    Navarro's job performance in her important role did not meet Zoox's

3    expectations.  As a result, and consistent with company practice, Navarro was offered

4    two options on Friday, March 21, 2025:   (a) enter into a formal "performance

5    improvement plan"—a plan for achieving necessary improvements in performance; or

6    (b) accept a severance package.  Navarro did not choose either option.

7        31.    Around this time, Zoox's People Resources team notified Zoox's Data

8    Protection team that Navarro should be placed on enhanced monitoring—a standard

9    Zoox notification procedure designed to ensure data security when an employee is

10   offered a performance improvement plan or severance package (or resigns from the

11   company).  Per standard procedure and consistent with company policy that employees

12   have no expectation of privacy with respect to use of company devices, networks and

13   accounts, Zoox's Data Protection team then used software to analyze Navarro's recent

14   activity on her company-issued laptop, including whether she had moved any Zoox

15   data from Zoox's network to external sources such as an external hard drive or cloud

16   drive.

17       32.    Upon its initial review, Zoox's Data Protection team determined that

18   Navarro had downloaded numerous files containing Zoox's data and information,

19   including Proprietary Information (as defined in the Proprietary Information

20   Agreement), to a personal external hard drive since, at least, March 21, 2025.  Her

21   downloads include files with detailed information about:  (a) critical Zoox intellectual

22   property related to the preparation of vehicles for operation on public roads and

23   regulatory requirements;  (b) vehicle features and capabilities and design, and

24   completion acceptance criteria necessary for the launch of Zoox's robotaxi product;  (c)

25   Zoox capabilities and features to build and operate a robotaxi business;  (d) the status

26   of Zoox's vehicle development, service and operations, and artificial intelligence

27   software; and (e) product roadmaps and company expansion plans.

28

33.   Navarro's conduct was not limited to selecting and downloading specific Zoox's documents and data. Zoox's Data Protection team determined that Navarro had used software that, for at least 30 days prior, had been used to capture hundreds and hundreds of screenshots of the data and information displayed on the screen of Navarro's company-issued laptop and that the screenshots were saved to the same hard drive to which Navarro downloaded the specific Zoox documents and data she had selected. As with the documents and data she downloaded, Navarro's screenshots contained Zoox's Proprietary Information including product roadmaps and company plans, product feature descriptions and company differentiation, and operational features relevant to Zoox's intellectual property and capabilities. The Data Protection team also learned that Navarro appeared to be creating screen recordings of internal Zoox meetings and presentations addressing highly sensitive non-public information (from the names of the video files) during her employment and had saved those videos to her external hard drive. Zoox also became aware that Navarro would be out of the country starting March 31, 2025.

34.   Navarro had no legitimate reason to copy, capture, screenshot, or screen video and download to her external drive Zoox's documents, information, and data, which constitute Proprietary Information as defined in the Proprietary Information Agreement or otherwise belong to Zoox. This Proprietary Information has independent economic value in the autonomous mobility market and could be used by Zoox's competitors to, *inter alia*, preempt its product offerings and market expansions and understand and use its product features and definitions, going-forward strategy, product differentiation, scaling plans, manufacturing capabilities, and safety methodology. Zoox has invested multiple billions of dollars developing unique intellectual property and go-to-market strategies for a very large and growing market publicly estimated to be sized at $100 billion in 2024 and with the potential to have a total addressable market on the order of trillions of dollars.

35.    The Data Protection team tracked Navarro's activity on her company-issued laptop in real-time and determined that Navarro was continuing to capture and download Zoox's sensitive information to her external drive. Because the hard drive included Zoox confidential and proprietary information and trade secrets, Zoox deployed an encryption program to encrypt the external device, as required by Zoox's policies for removable media. About 15 minutes after the program was initiated, Navarro's external drive was disconnected from the company-issued laptop and the laptop was powered down. When Navarro used the laptop to log into Zoox's systems approximately 12 minutes later, the laptop's log files—the records of activity on the laptop while in Navarro's possession—had been manually deleted. Based on this timing and sequence of events, Zoox is informed and believes that Navarro had become aware of Zoox efforts to protects its sensitive information and sought to cover her tracks.

36.    On March 28, 2025, Zoox notified Navarro that it was investigating her conduct with respect to Zoox's proprietary information and requested her cooperation. Navarro refused. As such, on March 28, 2025, Zoox notified Navarro that it was terminating her employment, effective immediately, due to her refusal to cooperate in its investigation. Since then, Navarro has continued to refuse to cooperate in the return of Zoox's confidential and proprietary information and trade secrets without unacceptable conditions to doing so.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

37.    Zoox realleges and incorporates by reference Paragraphs 1 through 36 as though fully set forth herein.

38.    Navarro entered into the Proprietary Information Agreement with Zoox on July 15, 2021.

39.     Zoox provided Navarro with employment, compensation, and access to and actual provision of confidential information and trade secrets in exchange for executing the Proprietary Information Agreement.

40.     Among other obligations under the Proprietary Information Agreement, Navarro agreed to:  (a) hold all Proprietary Information (as defined in the agreement) in strict confidence; (b) not use, reproduce, disclose, or deliver Proprietary Information except as may be necessary to perform her duties as a Zoox employee or as permitted by a duly authorized Zoox representative; (c) only maintain such Proprietary Information as she has a current "need to know" and to promptly return or dispose of Proprietary Information once that need to know no longer exists; and (d) return all Proprietary Information upon termination of her employment.

41.     The Proprietary Information Agreement is a valid and enforceable contract, designed to protect Zoox's legitimate business interests including protection of its proprietary, confidential, and trade secret information.

42.     Zoox has fully performed its contractual obligations to Navarro under the Proprietary Information Agreement.

43.     Navarro has breached the Proprietary Information Agreement by (at least):  (a) using, reproducing, disclosing, and/or delivering Proprietary Information when it was not necessary to perform her duties as a Zoox employee or permitted by a duly authorized Zoox representative; (b) maintaining Proprietary Information that she did not have a current "need to know"; and (c) failing and refusing to return all Proprietary Information upon termination of her employment.

44.     Zoox has suffered and will continue to suffer damages as a result of Navarro's breach of contract, including diminished value of its Proprietary Information, loss of its competitive advantage, and loss of business.

45.     As Navarro acknowledged when signed the Proprietary Information Agreement, her breach of the agreement has caused and will cause irreparable injury

to Zoox for which pecuniary compensation would not afford adequate relief, thereby requiring injunctive relief in addition to compensatory relief.

46.    Navarro's actions will continue to harm Zoox if not enjoined.

47.    Should the Court grant injunctive relief to Zoox, the burden on Navarro would be slight compared to the injury to Zoox if injunctive relief is not granted.

48.    Navarro agreed that injunctive relief would be an appropriate remedy in the event she breached the Proprietary Information Agreement.

49.    Granting an injunction will not disserve the public interest.  Indeed, injunctive relief is a contracted-for remedy in the Proprietary Information Agreement.

## SECOND CAUSE OF ACTION

### (Trade Secrets Misappropriation, 18 U.S.C. § 1836 *et seq.*)

50.    Zoox realleges and incorporates by reference Paragraphs 1 through 49 as though fully set forth herein.

51.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the United States Code, forbids threatened and actual misappropriation of trade secrets if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

52.    Under the DTSA, "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (a) the owner thereof has taken reasonable measures to keep such information secret, and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

53.     Under the DTSA, "misappropriation" means:  (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret, or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret, acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, or derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret, or (iii) before a material change of the position of the person, knew or had reason to know that the trade secret was a trade secret and knowledge of the trade secret had been acquired by accident or mistake.

54.     Under the DTSA, "improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

55.     Zoox dedicated and continues to dedicate substantial time and resources towards developing its trade secrets, as detailed above.   The trade secrets misappropriated by Navarro include Zoox's:  (a) strategy and product differentiation, (b) manufacturing, product, and testing methodologies, (c) and scaling and expansion plans, (d) intellectual property related to the preparation of vehicles for operation on public roads and regulatory requirements; (e) vehicle features and capabilities and design, and completion acceptance criteria necessary for the launch of Zoox's robotaxi product; (f) capabilities and features to build and operate a robotaxi business; (g) the status of Zoox's vehicle development, service and operations, and artificial intelligence software; and (h) product roadmaps and company expansion plans.  Zoox is informed and believes that numerous additional trade secrets are contained on Navarro's external drive.   Zoox continues to investigate the full extent of Navarro's

1 misappropriation of its trade secrets, but does not have access to the underlying files
2 and screen recordings saved to Navarro's drive, only the file names, and therefore must
3 obtain the return of its files and documents in order to fully identify the trade secrets
4 at issue.

5     56.    At all relevant times, Zoox has made reasonable efforts to ensure its trade
6 secrets remain confidential, proprietary, secret, and available for Zoox's commercial
7 use only.  The trade secrets identified above and others almost certainly contained on
8 Navarro's external hard drive and possibly elsewhere have independent economic
9 value in the autonomous mobility market and could be used by Zoox's competitors to,
10 *inter alia*, preempt its product offerings and market expansions and understand and
11 use its product features and definitions, going-forward strategy, product
12 differentiation, scaling plans, manufacturing capabilities, and safety methodology.
13 Zoox has invested multiple billions of dollars developing unique intellectual property
14 and go-to-market strategies for a very large and growing market sized at $55 billion in
15 2025.

16     57.    At all relevant times, Zoox has made reasonable efforts to ensure its trade
17 secrets remain confidential, proprietary, secret, and available for Zoox's commercial
18 use only.

19     58.    In her role at Zoox, Navarro had access to and knowledge of Zoox's trade
20 secrets.

21     59.    Navarro knew she had a duty to maintain the secrecy of Zoox's trade
22 secrets due to her acknowledgement of such under, *inter alia*, the Proprietary
23 Information Agreement and the 2020 Handbook and updated policies available on the
24 Zoox intranet.

25     60.    Navarro improperly acquired, used, or disclosed Zoox's trade secrets.  She
26 had no legitimate business reason to access, create and download the files, screenshots,
27 and screen recordings. In doing so, Navarro acted deliberately, maliciously and with
28 an intent to cause harm to Zoox.

Case No.
COMPLAINT

61.    Zoox has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation including harm to its reputation, good will, and competitive advantage.

62.    Zoox has no adequate remedy at law for such present and future harm, and therefore, is entitled to injunctive relief in addition to compensatory relief.

63.    Navarro's actions will continue to cause irreparable harm to Zoox if not enjoined.

64.    Additionally, because Navarro has committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Zoox's rights, Zoox is entitled to recover punitive damages from Navarro, in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

### (Violation of Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c))

65.    Zoox realleges and incorporates by reference Paragraphs 1 through 64 as though fully set forth herein.

66.    California Penal Code § 502 makes it a crime, for which there is a civil remedy, to:  (a) "knowingly access[] and without permission take[], cop[y], or make[] use of any data from a computer, computer system, or computer network, or take[] or cop[y] any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network"; and (b) "[k]nowingly access[] and without permission add[], alter[], damage[], delete[], or destroy[] any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."  Cal. Penal Code §§ 502(c)(2), (c)(4).

67.    Navarro knowingly accessed and without Zoox's permission took, copied, or made use of Zoox's data from its computer, system, and/or network and deleted

1  and/or destroyed data which resided or existed internal to a Zoox computer, computer

2  system, or computer network

3     68.    Zoox has suffered and will continue to suffer damages and irreparable

4  harm as a result of unlawful and unauthorized conduct.

5     69.    Zoox has no adequate remedy at law for such present and future harm,

6  and therefore, is entitled to injunctive relief in additional to compensatory relief.

7     70.    Navarro's actions will continue to cause irreparable harm to Zoox if not

8  enjoined.

9     71.    Additionally, because Navarro has committed the acts alleged herein

10  willfully, in bad faith, from an improper motive amounting to malice, and in conscious

11  disregard of Zoox's rights, Zoox is entitled to recover punitive damages from Navarro,

12  in an amount according to proof at trial.

13                          **PRAYER FOR RELIEF**

14     With respect to this Complaint, and based on the foregoing, Zoox prays for the

15  following relief:

16     1.    entry of a Temporary Restraining Order and Preliminary Injunction

17  against Navarro ordering her to submit all of her personal devices and accounts for

18  forensic examination, and submit to expedited discovery;

19     2.    entry of a Temporary Restraining Order, Preliminary Injunction, and

20  Permanent Injunction against Navarro enjoining her from copying, transmitting,

21  using or disclosing Zoox's trade secrets and proprietary and confidential information;

22     3.    entry of a Temporary Restraining Order, Preliminary Injunction, and

23  Permanent Injunction against Navarro enjoining her from using, referencing, or

24  disclosing Zoox's trade secrets under the Defend Trade Secrets Act;

25     4.    entry of a Temporary Restraining Order, Preliminary Injunction, and

26  Permanent Injunction against Navarro enjoining her from making use of any data

27  taken from a Zoox computer, computer system, or computer network pursuant to

28  California's Computer Data and Fraud Act;

Case No.
COMPLAINT

1    5.    actual, compensatory, treble, punitive and exemplary damages to be

2  determined at trial;

3    6.    attorneys' fees and costs; and

4    7.    such other and further relief the Court deems as just.

5                      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

6  Dated:  April 24, 2025          By    _____
                                              */s/ Jennifer G. Redmond*
7                                        JENNIFER G. REDMOND
                                         BENJAMIN O. AIGBOBOH
8                                        MARGARET M. SHEERIN

9                                        *Attorneys for Plaintiff*
10                                        ZOOX, INC.

SMRH:4936-3032-0694

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# ZOOX

# EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

**Employee Name**  Veronica Navarro
_____

      In consideration of my employment or continued employment by Zoox, Inc. (the "Company"), I hereby agree to the restrictions and obligations placed by the Company on my use and development of certain information, technology, ideas, inventions and other materials, as set forth in this Employee Proprietary Information and Invention Assignment Agreement (the "Agreement").

1. **At-Will Employment.** I acknowledge that nothing in this Agreement shall be construed to imply that the term of my employment is guaranteed for any period of time. Unless otherwise stated in a written agreement signed by a duly authorized representative of the Company other than me, my employment is "at-will" and may be terminated with or without cause and with or without notice.

2. **Proprietary Information.**

   (a) Definition. I understand that the term "Proprietary Information" in this Agreement means any and all information and materials, in whatever form, tangible or intangible, whether disclosed to or learned or developed by me before or after the execution of this Agreement, whether or not marked or identified as confidential or proprietary, pertaining in any manner to the business of or used by the Company and its affiliates, or pertaining in any manner to any person or entity to whom the Company owes a duty of confidentiality. Proprietary Information includes, but is not limited to, the following types of information and materials:  (i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials; (ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential; (iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts; (iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other employees and independent contractors; and (v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.

   (b) Exclusions. Proprietary Information does not include any information or materials that I can prove by written evidence (i) is or becomes publicly known through lawful means and without breach of this Agreement by me; (ii) was rightfully in my possession or part of my general knowledge prior to my employment by the Company; or (iii) is disclosed to me without confidential or proprietary restrictions by a third party who rightfully possesses the

This document is proprietary and confidential. No part of this document may be disclosed in any manner to a third party without prior written consent of Zoox.

 information or materials without confidential or proprietary restrictions. However, to the extent the Company owes a duty of confidentiality to a third party with respect to such information, idea or material, such information, idea or material shall continue to be Proprietary Information until such time as the Company's duty of confidentiality terminates or expires. If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status.

(c) Prior Knowledge. Except as disclosed on Schedule A to this Agreement, I have no information or materials pertaining in any manner to the business of or used by the Company and its affiliates, other than information I have learned from the Company in the course of being hired and employed.

3. Restrictions on Proprietary Information.

(a) Restrictions on Use and Disclosure. I agree that, during my employment and at all times thereafter, I will hold the Proprietary Information in strict confidence and I will not use, reproduce, disclose or deliver, directly or indirectly, any Proprietary Information except to the extent necessary to perform my duties as an employee of the Company or as permitted by a duly authorized representative of the Company. I will use my best efforts to prevent the unauthorized use, reproduction, disclosure or delivery of Proprietary Information by others.

(b) Location. I agree to maintain at my work station and/or any other place under my control only such Proprietary Information as I have a current "need to know." I agree to return to the appropriate person or location or otherwise properly dispose of Proprietary Information once that need to know no longer exists.

(c) Third Party Information. I recognize that the Company has received and will receive Proprietary Information from third parties to whom or which the Company owes a duty of confidentiality. In addition to the restrictions set forth in this Section 3, I will not use, reproduce, disclose or deliver such Proprietary Information except as permitted by the Company's agreement with such third party.

(d) Interference with Business. I acknowledge that, because of my responsibilities at the Company, I will help to develop, and will be exposed to, the Company's business strategies, information on customers and clients, and other valuable Proprietary Information and trade secrets, and that use or disclosure of such Proprietary Information and trade secrets in breach of this Agreement would be extremely difficult to detect or prove. I also acknowledge that the Company's relationships with its employees, customers, clients, vendors, and other persons are valuable business assets.

Therefore, I agree as follows:

(i) I shall not, during my employment or for a period of one year following termination of my employment with the Company for any reason, directly or indirectly solicit, induce, recruit, or encourage any officer, director, employee, independent contractor or consultant of the Company who was employed by or affiliated with the Company at the time of my termination to leave the Company or terminate his or her employment or relationship with the Company.

ZOOX                    EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

(ii)  I shall not, following the termination of my employment with the Company for any reason, use the Company's Proprietary Information or trade secrets or any other means that would amount to unfair competition to solicit any of the Company's customers, clients, vendors, business partners, or suppliers, or otherwise interfere with any business relationship or contract between the Company and any of its customers, clients, vendors, business partners, or suppliers.

(iii)           I shall not, for a period of one year following the termination of my employment, solicit any actual or prospective customer or client of the Company for the purpose of selling products or services competitive with the Company's that I had notice of or worked with during my employment with the Company and that I received trade secret or Proprietary Information about during my employment.

(e)  DTSA Notice. I acknowledge receipt of the following notice pursuant to 18 U.S.C. § 1833(b)(1) (Defend Trade Secrets Act):

An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

I understand and agree that nothing in this Section 3 limits or modifies in any way my duties under any other Section of this Agreement or any applicable law regarding the Company's Proprietary Information.

4.  **Privacy; Protection of Personal Information.**

(a)  Privacy. I acknowledge that the Company may access all information and materials generated, received or maintained by or for me on the premises or equipment of the Company (including, without limitation, computer systems and electronic or voice mail systems), and I hereby waive any privacy rights I may have with respect to such information and materials.

(b)  Protection of Personal Information. During my employment with the Company and thereafter, I shall hold Personal Information in the strictest confidence and shall not disclose or use Personal Information about other individuals, except in connection with my work for the Company, or unless expressly authorized in writing by an authorized representative of the Company. I understand that there are laws in the United States and other countries that protect Personal Information, and that I must not use Personal Information about other individuals other than for the purposes for which it was originally used or make any disclosures of other individuals' Personal Information to any third party or from one country to another without prior approval of an authorized representative of the Company. I understand that nothing in this Agreement prevents me from discussing my wages or other terms

 EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

and conditions of my employment with coworkers or others, unless such discussion would be for the purpose of engaging in unfair competition or other unlawful conduct.

(c) <u>Definition of Personal Information</u>. "Personal Information" means personally identifiable information about employees, independent contractors or third-party individuals, including names, addresses, telephone or facsimile numbers, Social Security Numbers, background information, credit card or banking information, health information, or other information entrusted to the Company.

5. **Inventions.**

(a) Definitions.

(i) I understand that the term "Inventions" in this Agreement means any and all ideas, concepts, inventions, discoveries, developments, modifications, improvements, know-how, trade secrets, data, designs, diagrams, plans, specifications, methods, processes, techniques, formulas, algorithms, tools, works of authorship, derivative works, software, content, textual or artistic works, mask works, video, graphics, sound recordings, structures, products, prototypes, systems, applications, creations and technologies in any stage of development, whether or not patentable or reduced to practice and whether or not copyrightable.

(ii) I understand that the term "Intellectual Property Rights" in this Agreement means any and all (A) patents, utility models, industrial rights and similar intellectual property rights registered or applied for in the United States and all other countries throughout the world (including all reissues, divisions, continuations, continuations-in-part, renewals, extensions and reexaminations thereof); (B) rights in trademarks, service marks, trade dress, logos, domain names, rights of publicity, trade names and corporate names (whether or not registered) in the United States and all other countries throughout the world, including all registrations and applications for registration of the foregoing and all goodwill related thereto; (C) copyrights (whether or not registered) and rights in works of authorship, databases and mask works, and registrations and applications for registration thereof in the United States and all other countries throughout the world, including all renewals, extensions, reversions or restorations associated with such copyrights, now or hereafter provided by law, regardless of the medium of fixation or means of expression; (D) rights in trade secrets and other confidential information and know-how in the United States and all other countries throughout the world; (E) other intellectual property or proprietary rights in the United States and all other countries throughout the world, including all neighboring rights and sui generis rights; (F) rights to apply for, file, register establish, maintain, extend or renew any of the foregoing; (G) rights to enforce and protect any of the foregoing, including the right to bring legal actions for past, present and future infringement, misappropriation or other violations of any of the foregoing; and (H) rights to transfer and grant licenses and other rights with respect to any of the foregoing, in the Company's sole discretion and without a duty of accounting.

(b) <u>Assignment</u>. I hereby assign, and agree to assign automatically upon creation, to the Company, without additional compensation, my entire right, title and interest (including, without limitation, all Intellectual Property Rights) in and to (a) all Inventions that are made, conceived, discovered or developed by me (either alone or jointly with others), or result from or are suggested by any work

ZOOX      EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) during the period of my employment with the Company, whether before or after the execution of this Agreement and whether or not made, conceived, discovered or developed during regular business hours or (ii) during or after the period of my employment with the Company, whether before or after the execution of this Agreement, if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company (collectively, the "Company Inventions"), and (b) all benefits, privileges, causes of action and remedies relating to the Company Inventions, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights in the Invention; and to settle and retain proceeds from any such actions), free and clear of all liens and encumbrances. I agree that all such Company Inventions are the sole property of the Company or any other entity designated by it, and all Intellectual Property Rights shall vest in and inure to the benefit of the Company or such other entity. I agree and acknowledge that all copyrightable Company Inventions shall be considered works made for hire prepared within the scope of my employment. **This paragraph does not apply to any invention which qualifies fully under the provisions of section 2870 of the labor code of the state of California, a copy of which is attached to this agreement as <u>Exhibit 1</u>. I understand that nothing in this agreement is intended to expand the scope of protection provided me by sections 2870 through 2872 of the California labor code.**

(c) <u>License</u>. If, under applicable law notwithstanding the foregoing, I retain any right, title or interest (including any Intellectual Property Right) with respect to any Company Invention, I hereby grant and agree to grant to the Company, without any limitations or additional remuneration, a worldwide, exclusive, royalty-free, irrevocable, perpetual, transferable and sublicensable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Company Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to such Company Invention.

(d) <u>Records; Disclosure</u>. I agree to keep and maintain adequate and current written records regarding all Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company. I agree to make available such records and disclose promptly and fully in writing to the Company all such Inventions, regardless of whether I believe the Invention is a Company Invention subject to this Agreement or qualifies fully under the provisions of Section 2870(a) of the California Labor Code, and the Company will examine such disclosure in confidence to make such determination. Any such records related to Company Inventions shall be the sole property of the Company.

(e) <u>Assistance and Cooperation</u>. I agree to cooperate with and assist the Company, and perform, during and after my employment, all acts deemed necessary or desirable by the Company, to apply for, obtain, establish, perfect, maintain, evidence, enforce or otherwise protect any of the full benefits, enjoyment, right, title and interest throughout the world in the Company Inventions. Such acts may include, but are not limited to, execution of assignments of title and other documents and assistance or cooperation in legal proceedings. Should the Company be unable to secure my signature on any such document, whether due to my mental or physical incapacity or any other cause,

ZOOX                    EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

I hereby irrevocably designate and appoint the Company and each of its duly authorized representatives as my agent and attorney-in-fact, with full power of substitution and delegation, to undertake such acts in my name as if executed and delivered by me (which appointment is coupled with an interest), and I waive and quitclaim to the Company any and all claims of any nature whatsoever that I may have or may later have for infringement of any Intellectual Property Rights in or to the Company Inventions.

(f)  Moral Rights. To the extent allowed by applicable law, the assignment of the Company Inventions includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby waive and agree not to institute, support, maintain or permit any action or proceeding on the basis of, or otherwise assert, such Moral Rights. I hereby authorize the Company to publish the Company Inventions in the Company's sole discretion with or without attributing any of the foregoing to me or identifying me in connection therewith and regardless of the effect on such Company Inventions or my relationship thereto. I agree to ratify and consent to any action that may be taken or authorized by the Company with respect to such Company Inventions, and I will confirm any such ratifications and consents from time to time as requested by the Company.

(g)  Excluded Inventions. I agree to identify in Schedule A all Inventions, if any, that I made, conceived, discovered or developed (either alone or jointly with others) prior to my employment by the Company that relate to the current or planned conduct of the Company's business (collectively, "Excluded Inventions"), which I wish to exclude from the scope of this Agreement. I represent and warrant that such list is complete and accurate, and I understand that by not listing an Invention on Schedule A as an Excluded Invention, I am acknowledging that such Invention was not made, conceived, discovered or developed prior to my employment by the Company.

(h)  Employee Inventions and Third Party Inventions. I shall not, without prior written approval by the Company, make any disclosure to the Company of or incorporate into Company property or Company Inventions any Invention owned by me or in which I have an interest ("Employee Invention"), Excluded Inventions, or owned by a third party ("Third Party Invention"). If, in the course of my employment with the Company, I make any disclosure to the Company of or incorporate into Company property or Company Inventions an Employee Invention or Excluded Inventions, with or without Company approval, I hereby grant and agree to grant to the Company a worldwide, nonexclusive, royalty-free, irrevocable, perpetual, transferable and sublicensable (through multiple tiers) license to make, have made, use, import, sell, offer to sell, practice any method or process in connection with, copy, distribute, prepare derivative works of, display, perform and otherwise exploit such Employee Invention or Excluded Invention and I agree not to make any claim against the Company or its affiliates, suppliers or customers with respect to any such Employee Invention or Excluded Inventions.

(i)  Representations; Warranties and Covenants. I represent, warrant and covenant that:
(i) I have the right to grant the rights and assignments granted herein, without the need for any assignments, releases, consents, approvals, immunities or other rights not yet obtained; (ii) any Company Inventions that are copyrightable works are my original works of authorship; and (iii) neither the Company Inventions nor any element thereof are subject to any restrictions or to any mortgages, liens, pledges, security interests, encumbrances or encroachments.



ZOOX                            EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

(j) <u>Adequate Consideration</u>. I acknowledge that the Company Inventions and the associated Intellectual Property Rights may have substantial economic value, that any and all proceeds resulting from use and exploitation thereof shall belong solely to the Company, and that the salary, equity incentives and/or other compensation I receive from the Company for my employment with the Company includes fair and adequate consideration for all assignments, licenses and waivers hereunder.

6. **Prohibition on Disclosure or Use of Third Party Confidential Information.** I will not disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or materials belonging to others (including without limitation any former employers) at any time, nor will I use any such information or materials in the course of my employment with the Company. I acknowledge that no officer or other employee or representative of the Company has requested or instructed me to disclose or use any such information or materials, and I will immediately inform my supervisor in the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any such information or materials.

7. **No Conflicts; Former Agreements.** I represent and warrant that I have no other agreements or relationships with or commitments to any other person or entity that conflict with my obligations to the Company as an employee of the Company or under this Agreement, and that my employment and my performance of the terms of this Agreement will not require me to violate any obligation to or confidence with another. I agree I will not enter into any oral or written agreement in conflict with this Agreement. Except as disclosed on Schedule A to this Agreement, I represent and warrant that I have not entered into any other agreements or relationships with or commitments to any other person or entity that obligates me to disclose to any such other person or entity any Proprietary Information or that assigns or obligates me to assign to any such other person or entity any Company Inventions.

8. **Third Party and Government Contracts.** I understand that the Company has or may enter into contracts with other persons or entities, including the United States government or its agents, under which certain Intellectual Property Rights will be required to be protected, assigned, licensed, or otherwise transferred. I hereby agree to be bound by all such agreements, and to execute such other documents and agreements as are necessary to enable the Company to meet its obligations under any such contracts.

9. **Termination; Return of Materials.** I agree to promptly return all property of the Company, including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written or tangible materials containing Proprietary Information in my possession upon termination of my employment for any reason or at any other time at the Company's request. Following my termination, I will not retain any written or other tangible material containing any Proprietary Information or information pertaining to any Company Invention. I understand that my obligations contained in this Agreement will survive the termination of my employment and I will continue to make all disclosures required of me by Section 5(d) above. In the event of the termination of my employment, I agree, if requested by the Company, to sign and deliver the Termination Certificate attached as Schedule B hereto. I agree that after the termination of my employment, I will not enter into any agreement that conflicts with my obligations under this Agreement and will inform any subsequent employers of my obligations under this Agreement. The termination of any employment or other agreement between



the Company and me shall not terminate this Agreement and each and all of the terms and conditions hereof shall survive and remain in full force and effect.

10. **Remedies.** I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets or other Intellectual Property Rights. In addition, I acknowledge that any breach by me of this Agreement would cause irreparable injury to the Company for which pecuniary compensation would not afford adequate relief and for which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Company. Therefore, I agree that if I breach any provision of this Agreement, the Company shall be entitled to injunctive or other equitable relief to remedy any breach or prevent any threatened breach of this Agreement, without the necessity of posting bond or other security or proving it has sustained any actual damage. This remedy will be in addition to any other remedies available to the Company at law or in equity.

11. **Miscellaneous Provisions.**

(a) Assignment; Binding Effect. I acknowledge and agree that my performance is personal hereunder, and that I shall have no right to assign, delegate or otherwise transfer and shall not assign, delegate or otherwise transfer any rights or obligations under this Agreement. Any such assignment, delegation or other transfer shall be null and void. This Agreement may be assigned or transferred by the Company. Subject to the foregoing, this Agreement shall inure to the benefit of the Company and its affiliates, successors and assigns, and shall be binding on me and my heirs, executors, administrators, devisees, spouses, agents, legal representatives and successors in interest.

(b) Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to its conflict of law rules.

(c) Jurisdiction. Except for actions for injunctive or other equitable relief, which may be brought in any court of competent jurisdiction, any legal suit, action or proceeding arising out of or relating to this Agreement shall be commenced in a federal court in the Northern District of California or in state court in Santa Clara County, California, and each party hereto irrevocably submits to the exclusive jurisdiction and venue of any such court in any such suit, action or proceeding.

(d) Severability. If any provision of this Agreement, or application thereof to any person, place, or circumstance, shall be held by a court of competent jurisdiction to be unenforceable, such provision shall be enforced to the greatest extent permitted by law and the remainder of this Agreement shall remain in full force and effect.

(e) Waivers. Delay or failure to exercise any right or remedy under this Agreement shall not constitute a waiver of such right or remedy. Any waiver of any breach of this Agreement shall not operate as a waiver of any subsequent breaches. All rights or remedies specified for a party herein shall be cumulative and in addition to all other rights and remedies of the party hereunder or under applicable law.

(f) Interpretation. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. Sections and section headings contained in this Agreement are for reference purposes only and shall not affect in any manner the meaning or interpretation

ZOOX                    EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

of this Agreement. Whenever the context requires, references to the singular shall include the plural and the plural the singular and any gender shall include any other gender.

(g) Entire Agreement; Amendment. This Agreement, including without limitation the Schedules and Exhibits hereto, constitutes the entire agreement between the Company and me with respect to the subject matter hereof and replaces and supersedes any prior or existing agreement entered into by me and the Company with respect to the subject matter hereof. This Agreement may not be modified or amended, in whole or in part, except by a writing signed by me and a duly authorized representative of the Company other than me. I agree that any subsequent change in my duties or compensation for employment will not affect the validity or scope of this Agreement.

IF YOU HAVE ANY QUESTIONS CONCERNING THIS AGREEMENT, YOU MAY WISH TO CONSULT AN ATTORNEY. MANAGERS, LEGAL COUNSEL AND OTHERS AT THE COMPANY ARE NOT AUTHORIZED TO GIVE YOU LEGAL ADVICE CONCERNING THIS AGREEMENT.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Acknowledged and Accepted: Zoox, Inc          Employee Signature

**Name:** Aicha Evans                          **Name:** Veronica Navarro

**Title:** CEO                                Date: 7/15/2021

**Name:** Jesse Levinson

**Title:** CTO and President

ZOOX                    EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

EXHIBIT 1

**CALIFORNIA LABOR CODE**
**SECTION 2870-2872**

**2870.**
(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

1. Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

2. Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**2871.**
No employer shall require a provision made void and unenforceable by Section 2870 as a condition of employment or continued employment. Nothing in this article shall be construed to forbid or restrict the right of an employer to provide in contracts of employment for disclosure, provided that any such disclosures be received in confidence, of all of the employee's inventions made solely or jointly with others during the term of his or her employment, a review process by the employer to determine such issues as may arise, and for full title to certain patents and inventions to be in the United States, as required by contracts between the employer and the United States or any of its agencies.

**2872.**
If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870. In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions.

## SCHEDULE A

**EMPLOYEE DISCLOSURE**

1. **PROPRIETARY INFORMATION.**
   Except as set forth below, I acknowledge that at this time I know nothing about the business or Proprietary Information of Zoox, Inc. (the "Company"), other than information I have learned from the Company in the course of being hired.

   _____

   _____

   _____

   (Check here ☐ if continued on additional attached sheets)

2. **EXCLUDED INVENTIONS.**
   I have made no Inventions prior to my employment with the Company that relate to the current or planned conduct of the Company's business and that are owned by me (either alone or jointly with others), and I do not wish to exclude any Excluded Inventions from the scope of the Agreement.

   _____x_____    I have made no Inventions prior to my employment with the Company that relate to the current or planned conduct of the Company's business and that are owned by me (either alone or jointly with others), and I do not wish to exclude any Excluded Inventions from the scope of the Agreement.

   _____    The following is a complete and accurate list of all Inventions I have made, conceived, discovered or developed prior to my employment with the Company that relate to the current or planned conduct of the Company's business and that are owned by me (either alone or jointly with others), which I wish to exclude from the scope of the Agreement:

   _____

   _____

   _____

ZOOX                          EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

(Check here ☐ if continued on additional attached sheets)

3. **CONFLICTING AGREEMENTS.**
   The following information is provided in accordance with Section 7 of the Agreement:

   _____        I am not party to any agreement or have any relationship with or commitment to any
                   other person or entity that obligates me to disclose to any such other person or entity
                   any Proprietary Information or that assigns or obligates me to assign to any such other
                   person or entity any Company Inventions.

   ___X___         The following is a complete and accurate list of all agreements, relationships with or
                   commitments to any other person or entity any that obligates me to disclose to any
                   such other person or entity any Proprietary Information or that assigns or obligates me
                   to assign to any such other person or entity any Company Inventions.

   _____

   _____

   _____

(Check here ☐ if continued on additional attached sheets)

Employee Signature

DocuSigned by:

_____
58E8BC3CA1274F3...

**Name:** Veronica Navarro

Date: 7/15/2021

Z O O X                    EMPLOYEE PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

## SCHEDULE B

**TERMINATION CERTIFICATE CONCERNING PROPRIETARY INFORMATION AND COMPANY INVENTIONS**

This document is to certify that I have returned all property of Zoox, Inc. (the "Company"), including, without limitation, (a) all source code, books, manuals, records, models, drawings, reports, notes, contracts, lists, blueprints, and other documents or materials and all copies thereof, (b) all equipment furnished to or prepared by me in the course of or incident to my employment, and (c) all written and tangible materials containing Proprietary Information in my possession.

I further certify that I have reviewed the Employee Proprietary Information and Invention Assignment Agreement (the "Agreement") signed by me and that I have complied with and will continue to comply with all of its terms, including, without limitation, (i) the disclosure of any Inventions made, conceived, discovered or developed by me (either alone or jointly with others) during my period of employment or after the termination of my employment if based on or using Proprietary Information or otherwise in connection with my activities as an employee of the Company, and (ii) the preservation as confidential of all Proprietary Information pertaining to the Company.  This certificate in no way limits my responsibilities or the Company's rights under the Agreement.

On termination of my employment with the Company, I will be employed by

_____ in the position of

_____.

Employee Signature

**Name:**

Date:

# EXHIBIT B

ZOOX

# CREW HANDBOOK
## UNITED STATES

ZOOX INC.
LAST UPDATED 12.07.2020

ZOOX

## 1.4 Code of Business Conduct and Ethics

In performing their job duties, Zoox crew should always act lawfully, ethically, and in the best interests of Zoox. This Code of Business Conduct and Ethics (the "Code of Conduct") sets out basic guiding principles. Crew who are unsure whether their conduct or the conduct of their coworkers complies with the Code of Conduct should contact their manager or the Legal Department. Crew may also report any suspected noncompliance as provided in the Legal Department's reporting guidelines.

Crew must follow applicable laws, rules and regulations at all times. Crew with questions about the applicability or interpretation of any law, rule or regulation, should contact the Legal Department, at legalcompliance@zoox.com.

### 1.4.1 Compliance with Laws, Rules and Regulations

In performing their job duties, crew are expected to use their judgment to act, at all times and in all ways, in the best interests of Zoox. A "conflict of interest" exists when a crew member's personal interest interferes with the best interests of Zoox. For example, a conflict of interest may occur when a crew or a family member receives a personal benefit as a result of the crew member's position with Zoox. A conflict of interest may also arise from a crew member's business or personal relationship with a customer, supplier, competitor, business partner, or other crew, if that relationship impairs the crew member's objective business judgment.

### 1.4.2 Conflicts of Interest

Because a crew member's receipt of gifts or services could create a conflict of interest, the Legal Department maintains guidelines for disclosure of gifts or services received from customers, suppliers, competitors or business partners. Crew should see Section 1.5 Giving and Receiving Gifts for more details.

Crew should attempt to avoid conflicts of interest, and crew who believe a conflict of interest may exist should promptly notify the Legal Department. The Legal Department will consider the facts and circumstances of the situation to decide whether corrective or mitigating action is appropriate.

ZOOX

## 1.8 Duty to Cooperate

The Company will investigate potential violations of Company policies or guidelines; crew are required to cooperate with the Company in such investigations. Violation of this policy may result in disciplinary action, up to and including termination of employment.

## 1.9 Confidentiality

In the course of employment with Zoox, crew will have access to Confidential Information regarding Zoox's business. As a condition of employment, each crew member must execute an Employee Proprietary Information and Inventions Assignment Agreement ("EPIIAA") prior to starting employment with Zoox.  The EPIIAA governs crew member's obligations regarding Confidential Information. If any crew member is unsure if they have signed the EPIIAA, they should reach out to the People team.

Each crew member is responsible for safeguarding Confidential Information obtained in connection with their employment.  Any breach of this policy will not be tolerated.

As detailed in the EPIIAA, Confidential Information includes, but is not limited to:

(i) research, development, technical or engineering information, know-how, data processing or computer software, programs, tools, data, designs, diagrams, drawings, schematics, sketches or other visual representations, plans, projects, manuals, documents, files, photographs, results, specifications, trade secrets, inventions, discoveries, compositions, ideas, concepts, structures, improvements, products, prototypes, instruments, machinery, equipment, processes, formulas, algorithms, methods, techniques, works in process, systems, technologies, disclosures, applications and other materials;

(ii) financial information and materials, including, without limitation, information and materials relating to costs, vendors, suppliers, licensors, profits, markets, sales, distributors, joint venture partners, customers, subscribers, members and bids, whether existing or potential;

(iii) business and marketing information and materials, including, without limitation, information and materials relating to future development and new product concepts;

(iv) personnel files and information about compensation, benefits and other terms of employment of the Company's other crew and independent contractors; and

ZOOX

(v) any other information or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of the Company.   This information is "confidential" regardless of whether it is marked as confidential, proprietary, or any other confidential marking.

All crew must protect Confidential Information by safeguarding it when in use, using it only for the business of the Company, and disclosing it only when authorized to do so and to those who have a legitimate business need to know about it. This duty of confidentiality applies whether crew are on or off Zoox premises, and during and after employment with Zoox.

For more information regarding Confidential Information, including information about the Defense of Trade Secrets Act ("DTSA"), please see the EPIIAA.

In accordance with the National Labor Relations Act and other applicable law, nothing in this Confidentiality Policy is intended to prohibit crew from discussing with one another wages, hours and terms and conditions of employment, or engaging in other legally protected activity.

ZOOX

# 15 / ACCEPTABLE USE POLICY

This policy specifies requirements for Zoox computing resources and protects our customers, Crew, company, and other partners from harm caused by both deliberate and inadvertent misuse of our computing resources and data. For crew based in all regions outside of the US, see the Acceptable Use Policy (Global).

Any crew member found to have violated this policy may be subject to disciplinary action, up to and including termination of employment.